EXHIBIT A

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

FILED

2018 OCT -3 A 9: 40

BUNCOMBE CO., C.S.C.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

18CV 04471

IRENE WARREN KENT, Administratrix
of the Estate of Michele Quantele Smiley,

     Plaintiff,

v.

VAN DUNCAN, in his official capacity as
Sheriff of Buncombe County; WESTERN
SURETY COMPANY, as surety for the
Sheriff; CHARLES J. WILHELM,
individually and in his official capacity;
EDWARD F. PARKER, individually and in
his official capacity; MEGHAN T. RIDDLE,
individually and in her official capacity;
RYAN P. ZABLOUDIL, individually and in
his official capacity; MATTHEW C. CORN,
individually and in his official capacity;
ETHAN GIBBS, individually and in his
official capacity; JOHN DOE #1,
individually and in his official capacity; and
JOHN DOE #2, individually and in his
official capacity; TINA COX MILLER,
LPN; and SOUTHEAST CORRECTIONAL
MEDICAL GROUP, PLLC,

     Defendants.

         **COMPLAINT**

         **Wrongful Death**
         **42 U.S.C. § 1983**

    **JURY TRIAL DEMANDED**

NOW COMES the Plaintiff, by and through her undersigned attorneys, complaining of the Defendants and alleges as follows:

1.    Plaintiff Irene Warren Kent, a citizen and resident of Buncombe County, is bringing this action in her capacity as the duly-appointed Administratrix of the Estate of her deceased granddaughter, Michele Quantele Smiley, who died on October 6, 2017 while in custody of Defendant Van Duncan and his officers in the Buncombe County Detention Facility.

2.    Defendant Van Duncan ("Sheriff Duncan") is the elected Sheriff of Buncombe County, charged by statute with control and operation of the Buncombe County Detention Facility (hereinafter, the "jail"). Sheriff Duncan has custody of the jail under N.C.G.S. § 162-22, non-delegable responsibility for the maintaining adequate supervision of the jail under N.C.G.S. § 162-24, and is the final policymaker for the jail for purposes of 42 U.S.C. § 1983.

3.     Sheriff Duncan's legal obligations include the specific duty under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees in order "to be at all times informed of the prisoners' general health and emergency medical needs." He is sued in his official capacity under N.C.G.S. § 58-76-5 and N.C.G.S. § 153A-435. He is also sued officially as the final policymaker responsible for the unlawful practices at the jail. Those practices include the systematic failure to immediately refer arrestees who are in urgent need of medical attention for emergency care and the systematic failure to supervise pre-trial detainees in accordance with correctional standards and state law and regulation, practices that led to the death of Smiley. Those practices also include the failure to train his detention facility officers and other agents in recognizing and properly responding to a methamphetamine overdose, a practice that also lead to the death of Smiley. Those practices, taken under color of law, were objectively unreasonable and deliberately indifferent and shocking to the conscience, violating Smiley's Fourteenth Amendment right to due process and were a proximate cause of her death.

4.     Defendant Western Surety Company is a South Dakota company and sued as the Sheriff's surety under N.C.G.S. § 58-76-5. Upon information and belief, Western Surety Company has issued the statutorily mandated surety bond to cover any injury caused by the neglect or misconduct of the Sheriff or those he employs. Sheriff Duncan is obligated under state law to obtain and maintain said surety bond and by doing so, waives sovereign immunity as to the claims in this matter, at least to the extent of the bond.

5.     Upon information and belief, Sheriff Duncan, through Buncombe County, has waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify him for any judgment against him or his employees named in this action.

6.     Further, N.C.G.S. § 153A-224 imposes an affirmative statutory duty upon Sheriff Duncan and his jail employees to provide continuous custodial supervision of all persons in custody and "to be at all times informed of the prisoners' general health and emergency medical needs." The violation of this mandatory statutory duty to keep each prisoner "protected" is a misdemeanor and creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

7.     Further, N.C.G.S. § 162-55 imposes an affirmative statutory duty upon Sheriff Duncan and his jail employees to refrain from "do[ing], or caus[ing] to be done, any wrong or injury to the prisoners committed to his custody, contrary to law." The violation of this mandatory statutory duty is also a misdemeanor and also creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

8.     Further, the defense of governmental or sovereign immunity as a defense to Plaintiff's state law tort claims has been expressly waived, upon information and belief, by Buncombe County's adoption of a resolution that deems the creation of its funded reserve to be the same as the purchase of insurance under N.C. Gen. Stat. § 153A-435(a).

9.     Upon information and belief, at all times relevant to this Complaint, Sheriff Duncan assigned Defendant Charles J. Wilhelm ("Wilhelm") supervisory responsibility for the

2

jail and either made Wilhelm a "keeper" of the jail under N.C.G.S. § 162-22 or identified him under N.C.G.S. § 162-24 to assist Sheriff Duncan in operating the jail. Defendant Wilhelm is sued in his official capacity for the failure of the jail to keep continuous custodial supervision of Smiley and in his individual and official capacity for the violation of Smiley's Fourteenth Amendment rights.

10.     At all times relevant to this Complaint, Defendants Edward F. Parker, Meghan T. Riddle, Ryan P. Zabloudil, Matthew C. Corn, Ethan Gibbs, John Doe #1, and John Doe #2 (hereinafter, collectively referred to as the "Defendant BSCO Jail Guards") upon information and belief, were all citizens and residents of Buncombe County, or residents of a county adjacent to Buncombe County, and were employed by Sheriff Duncan as deputies and/or detention officers and were on duty at the county jail on October 6, 2017. They are sued in their individual and official capacities. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from these claims against these Defendants. Thus, they are liable in their official capacity for their negligence.

11.     To the extent these Defendants assert public officer immunity, Defendants Edward F. Parker, Meghan T. Riddle, Matthew C. Corn, Ryan P. Zabloudil, Ethan Gibbs, John Doe #1, and John Doe #2 are sued individually for conduct outside the scope of their authority and for malicious, willful and wanton disregard for the rights and safety and dignity of Plaintiff's decedent, including failing to provide appropriate medical treatment, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital emergency department after Smiley reported that she had swallowed "a lot" of "meth" while she was being processed and showed signs of a severe drug overdose; placing Smiley in a jail cell and leaving her there to suffer until she vomited, became unconscious, and stopped breathing; standing outside of her jail cell and watching her lie motionless and continuing to fail to provide appropriate medical treatment, to contact emergency medical services, and/or to transport Smiley to the hospital emergency department; administering a dose of Naloxone, which has no effect on a methamphetamine overdose; and the systematic avoidance of required in-person cell checks. Such conduct violates their statutory duty under N.C.G.S. § 153A-224 to ensure continuous supervision of inmates and "to be at all times informed of the prisoners' general health and emergency medical needs," and pierces the shield of public officer immunity.

12.     John Doe #1 and John Doe #2 are sued under fictitious names because it is believed that other deputies and/or detention officers contributed through their acts or omissions to the death of Michele Quantele Smiley. Pursuant to N.C.G.S. § 1-166, Plaintiff will seek to amend this pleading when their true names are discovered and add them as party defendants.

13.     At all times relevant to this Complaint, Defendant Tina Cox Miller ("Miller") was a citizen and resident of McDowell County and a licensed practical nurse (LPN) who was employed by SECMG to provide nursing services in the Buncombe County jail.

14.     Defendant Southeast Correctional Medical Group, PLLC ("SECMG") is a professional limited liability company with its principal office in the State of Georgia. According to its website, it provides healthcare services in 110 facilities in more than 60 counties in 7 states, and cares for more than 26,000 inmates daily.

3

15.     SECMG is sued under the doctrine of *respondeat superior* for the negligence of its agent. Defendant Miller.

16.     At all times relevant to this Complaint, SECMG had contracted with the Sheriff of Buncombe County to provide medical care for persons detained in the Buncombe County jail pursuant to a medical care plan submitted to and approved by Buncombe County officials as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001.

17.     Attached hereto and marked **Plaintiff's Exhibit 1** and incorporated by reference is Section 702E of the Detention Health Plan in effect on October 6, 2017, which provides: "Arrestees who are unconscious, semi-conscious, bleeding, unstable, or urgently in need of medical attention are referred immediately for emergency care."

18.     Attached hereto and marked **Plaintiff's Exhibit 2** and incorporated by reference is Section 708E of the Detention Health Plan in effect on October 6, 2017, which provides: "Emergency transportation is available for an inmate from the facility when a condition exists that exceeds the medical capabilities of the [Buncombe County Detention Facility]."

19.     Attached hereto and marked **Plaintiff's Exhibit 3** and incorporated by reference is Section 706G of the Detention Health Plan in effect on October 6, 2017, which provides: "The responsible Health Authority shall define and approve written policy, procedures, and specific protocols to manage [Buncombe County Detention Facility] inmates under the influence of alcohol and drugs . . . consistent with local, state and federal laws which shall include . . . 3. Emergency, life-threatening situation guidelines[.]"

20.     Based on SECMG's contract to provide medical care to Buncombe County prisoners pursuant to a medical plan required by state statute and regulation, SECMG is a "person" acting under color of law for purposes of 42 U.S.C. § 1983. It is sued for violating the Fourteenth Amendment rights of the decedent in failing to provide her adequate medical care while in pretrial custody.

21.     SECMG is also sued under state law for the wrongful death of Plaintiff's decedent by failing to adequately supervise decedent's medical care and allowing SECMG employees and agents to exceed the scope of their medical licenses, which proximately led to her death.

22.     Defendant Miller is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Buncombe County jail pursuant to state law and regulation. Her actions and omissions violated decedent's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

23.     Further, the actions and omissions of Defendant Miller described herein were so outrageous as to shock the conscience of the community and violate Smiley's right to substantive due process.

24.     Defendant Miller is also sued under state law for wrongful death, as she owed a duty of care to Smiley and violated the standards of medical care applicable to licensed practical

4

nurses, including exceeding the scope of her license by providing inadequate medical care without proper supervision by a licensed physician, and her breach of that standard of care and duty owed proximately caused the death of Plaintiff's decedent.

## FACTS

25. On October 6, 2017, at approximately 11:46 a.m., Michele Smiley began the process of being booked into the Buncombe County jail, after she was arrested for probation violations that included: 1) failing to report for appointments with her probation officer, 2) not being at her residence on four different occasions after 6:00 p.m., in violation of a curfew condition, and 3) failing to report for a substance abuse assessment.

26. Smiley was asked by one of the Defendant BCSO Jail Guards whether she'd had lunch. She took a few bites of a bologna sandwich, and drank some juice. One of the BCSO Jail Guards then took Smiley's picture and scanned her with a metal detector.

27. Smiley told one of the Defendant BCSO Jail Guards, "I swallowed something so I wouldn't get caught with it when my probation officer came."

28. One of the Defendant BCSO Jail Guards called for a nurse.

29. Defendant Miller came to the booking room and found Smiley sitting in a chair. Defendant Miller found Smiley to be alert and verbal but a little anxious. Defendant Miller asked Smiley what was going on, and Smiley told her that she had "taken something."

30. Smiley was attempting to eat lunch and repeated several times, "I can't do this," and, "I don't feel right." After taking a bite of her baloney sandwich, and a small drink of her juice, Smiley put her lunch tray down. Smiley held the bite of sandwich in her left jaw and later she spit it out in the toilet.

31. Defendant Miller asked Smiley what she had swallowed several times, and Smiley finally said that she had swallowed "Meth."

32. Defendant Miller asked Smiley how much she has swallowed and Smiley said, "I don't know, just a lot."

33. One or more of the Defendant BCSO Jail Guards were near enough to Smiley and Defendant Miller to overhear their conversation.

34. One or more of the Defendant BCSO Jail Guards knew at that time that Smiley had ingested an unknown quantity of methamphetamine.

35. Neither Defendant Miller nor any of the Defendant BCSO Jail Guards that were present in the booking area with Smiley called for emergency medical services or requested authorization from the director of the jail to immediately transfer Smiley to Mission Hospital after Smiley had told them that she had swallowed "a lot" of methamphetamine.

5

36. At that time, Smiley began showing signs of agitation, restlessness, and irritability, and was constantly moving and unable to sit still.

37. Smiley stated that she "was burning up," and she was repeatedly pulling at her hoodie (sweatshirt) while sitting in a chair in the booking area of the jail.

38. Neither Defendant Miller nor any of the Defendant BCSO Jail Guards that were present with Smiley called for emergency medical services or requested authorization from the director of the jail to immediately transfer Smiley to Mission Hospital after Smiley: had told them that she had swallowed "a lot" of methamphetamine; had stated that she "was burning up;" and was repeatedly pulling at her hoodie while sitting in a chair in the booking area of the jail.

39. Smiley was taken to the bathroom and began having extreme anxiety, increasing unsteadiness, and was pacing in the bathroom, back and forth from the wall to the sink.

40. Smiley attempted to vomit in the bathroom, but could not.

41. One of the Defendant BCSO Jail Guards was in the bathroom with Smiley and Defendant Miller, and gave Smiley a light shirt.

42. Smiley took off the sweatshirt that she had been wearing and put on the light shirt.

43. In the bathroom, Smiley became diaphoretic (was sweating heavily) and repeatedly splashed cool water from the sink onto her face.

44. Defendant Miller attempted to help cool Smiley down by applying cool, wet paper towels to her face and the back of her neck.

45. At that point, Smiley's hands were extremely red, with some red dark pink color around her nails at the cuticles.

46. Defendant Miller encouraged Smiley to "slow down" and "take deep breaths," to which Smiley repeatedly responded: "I can't."

47. Smiley also told Defendant Miller and the Defendant BCSO Jail Guard who was in the bathroom with them: "I just don't feel right."

48. Neither Defendant Miller nor any of the Defendant BCSO Jail Guards that were present with Smiley called for emergency medical services or requested authorization from the director of the jail to immediately transfer Smiley to Mission Hospital after Smiley: had told them that she had swallowed "a lot" of methamphetamine; had stated that she "was burning up;" was repeatedly pulling at her hoodie while sitting in a chair in the booking area of the jail; went to the bathroom and began having extreme anxiety, increasing unsteadiness, and was pacing back and forth; attempted to vomit in the bathroom; became diaphoretic (was sweating heavily); repeatedly splashed her face with water; said "I can't" when told to "slow down" and "take deep breaths;" and said, "I just don't feel right."

6

49.     One of the Defendant BCSO Jail Guards told Smiley to come back to the booking area and sit down. Smiley followed these directions and walked back to the chair and sat down.

50.     At that point, Smiley was sliding up and down in the chair and constantly moving and was clearly in distress.

51.     Defendant Miller attempted to obtain Smiley's blood pressure, but could not because Smiley was constantly moving and would not be still. When Defendant Miller asked Smiley to be still, she said, "I can't."

52.     Defendant Miller left the booking area and came back in with several of the Defendant BCSO Jail Guards, who assisted in restraining Smiley while Miller attempted to get her vital signs. Several of the Defendant BCSO Jail Guards laced their own legs around Smiley's legs to hold her down, and Defendant Miller was able to get Smiley's pulse – which she found to be steady, regular, and faint – but not her blood pressure.

53.     At that point, Smiley had been in the county jail for at least 25 minutes, from approximately 11:46 a.m. until approximately 12:12 p.m.

54.     During that 25-minute time period, Smiley: had told Defendant Miller and one or more of the Defendant BCSO Jail Guards that she had swallowed "a lot" of methamphetamine; had stated that she "was burning up;" was repeatedly pulling at her hoodie while sitting in a chair in the booking area of the jail; went to the bathroom and began having extreme anxiety, increasing unsteadiness, and was pacing back and forth; attempted to vomit in the bathroom; became diaphoretic (was sweating heavily); repeatedly splashed her face with water; said "I can't" when told to "slow down" and "take deep breaths;" and said, "I just don't feel right;" and went back out into the booking area and was sliding up and down in the chair and constantly moving and was clearly in distress.

55.     By approximately 12:13 p.m., it was evident that Smiley was undergoing a severe reaction to a drug overdose, as distinct from someone being belligerent or combative.

56.     Defendant Miller and the Defendant BCSO Jail Guards who were with Smiley understood that she was undergoing a severe reaction to a methamphetamine overdose.

57.     One of the Defendant BCSO Jail Guards put his hand on Smiley's thigh and said, "Don't worry, you're not going to die. You're just going to get really high."

58.     Rather than calling for emergency medical services, several of the Defendant BCSO Jail Guards then took Smiley to "Cell #1" in the jail and placed her in the cell at approximately 12:17 p.m.

59.     The jail cell where Smiley was confined was remotely monitored by one or more of the Defendant BCSO Jail Guards on a computer screen showing images from a video camera that was filming and recording Smiley in her cell.

60. After placing Smiley in the jail cell, the Defendant BCSO Jail Guards failed to place Smiley on a four-times-per-hour direct observation watch, as required by 10A NCAC 14J.0601(c).

61. As soon as Smiley was put in the jail cell, she started rolling around, fanning herself, taking her clothes off, and thrashing about, apparently in great distress.

62. Smiley was left in the jail cell for approximately 15 minutes before anyone checked on her in person.

63. At that point, she was lying motionless in the cell and, it is believed, was already in full cardiac arrest.

64. Smiley was then left in the jail cell for another approximately 30-45 minutes before anyone checked on her in person. She was still lying motionless in the cell.

65. The Defendant BCSO Jail Guard who checked on her at that point had been with her from the beginning of the booking process. He stood outside of Smiley's jail cell and stared at her lying motionless in the cell for several minutes.

66. The Defendant BCSO Jail Guard who stood outside Smiley's jail cell then called two other jail guards over to ask if they thought Smiley was breathing. The three of them observed Smiley from outside the cell for about 5-10 minutes as she lay there motionless.

67. At approximately 1:19 p.m., several of the Defendant BCSO Jail Guards finally opened Smiley's cell door and went in. One of them started slapping Smiley in the face, saying, "Hey, you've got to wake up!" Another said, "She has no pulse!" The Defendant BCSO Jail Guards who went into the cell spoke in loud voices and were visibly unsettled by the situation, having apparently just then realized the seriousness of Smiley's medical condition.

68. One of the Defendant BCSO Jail Guards, or a nurse on duty, then gave Smiley a dose of Naloxone (Narcan), which reduces the effect of an opiod overdose, but has no effect on a methamphetamine overdose.

69. At that time, one of the Defendant BCSO Jail Guards began cardio pulmonary resuscitation (CPR) and someone gave Smiley one or two doses of epinephrine. Smiley's ribs were fractured by the chest compressions.

70. At approximately 1:26 p.m., well over an hour after it was clear that Smiley was undergoing a severe reaction to a methamphetamine overdose, one of the Defendant BCSO Jail Guards finally called emergency medical services.

71. Buncombe County EMS personnel arrived and took over medical treatment at approximately 1:32 p.m., and the Advanced Life Support (ALS) team from emergency medical services found Smiley to be pulseless.

8

72.     Smiley was intubated. given a dose of dextrose, and chest compressions were continued with an automated compression device.

73.     After several minutes, the compression device was removed, and another pulse check was done, revealing no pulse. Her core temperature was 104.4 degrees Fahrenheit.

74.     Smiley was taken to the Emergency Department of Mission Hospital and arrived there at approximately 1:58 p.m.  She was noted to be in asystole, which is the state of total cessation of electrical activity from the heart.

75.     After looking at her heart with bedside ultrasound and finding no activity whatsoever, Smiley was pronounced dead at 2:03 p.m.

76.     An autopsy report later performed by a medical doctor indicated that the cause of death was "Methamphetamine toxicity."

## COMPLIANCE WITH RULE 9(j) OF THE
## NORTH CAROLINA RULES OF CIVIL PROCEDURE

77.     The medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care and professional health services rendered to Plaintiff by Defendant Miller in this case did not comply with the accepted standards of care for her healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein, and that the breach of that standard of care and duty owed proximately caused the death of Plaintiff's decedent.

78.     Plaintiff alleges that the negligent acts complained of also involve breaches of common law and statutory duties that amount to ordinary (as opposed to medical or professional) negligence, and, as such, do not involve the rendering or failure to render medical care or professional health services to Plaintiff's decedent, and, accordingly, are not subject to the purported certification requirements of North Carolina Rule of Civil Procedure 9(j).

## FIRST CAUSE OF ACTION
## WRONGFUL DEATH: DEFENDANT DUNCAN
## AND DEFENDANT BCSO JAIL GUARDS

79.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

80.     N.C.G.S. § 153A-224 is a safety statute expressly enacted to protect a detainee like Smiley whose liberty has been taken and who is confined in a local detention facility.

81.     The Buncombe County Detention Facility is a local confinement facility for purposes of N.C.G.S. § 153A-224.

9

82.     The Defendant BCSO Jail Guards' actions and omissions, including failing to provide appropriate medical treatment, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital emergency department after Smiley reported that she had swallowed "a lot" of "meth" while she was being processed; failing to provide appropriate medical treatment, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital emergency department after Smiley showed signs of a severe drug overdose; placing Smiley in a jail cell and leaving her there to suffer until she vomited, became unconscious, and stopped breathing; standing outside of her jail cell and watching her lie motionless and continuing to fail to provide appropriate medical treatment, to contact emergency medical services, and/or to transport Smiley to the hospital emergency department; administering a dose of Naloxone, which has no effect on a methamphetamine overdose; and the systematic avoidance of required in-person cell checks, all violated the affirmative obligation under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and "be at all times informed of the prisoners' general health and emergency medical needs," as well as state regulations on observing inmates and reporting medical concerns.

83.     Their breaches of the affirmative duty imposed by a safety statute constituted negligence *per se*.

84.     These breaches of statutory duties imposed by N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and "be at all times informed of the prisoners' general health and emergency medical needs." precludes the application of governmental immunity.

85.     Sheriff Duncan is liable, under the doctrine of *respondeat superior*, both under common law and by statute, for the actions and omissions of the Defendant BCSO Jail Guards that led to Smiley's death, and for the failures of the Defendant BCSO Jail Guards. The Sheriff's duty to operate the county jail in a safe manner is a non-delegable duty under N.C.G.S. § 162-24.

86.     Further, the Defendant BCSO Jail Guards are individually liable. Some of their actions were taken outside the scope of their authority, including the systematic avoidance of required in-person cell checks. Further, their actions of failing to provide appropriate medical treatment, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" while she was being processed, after she showed signs of a severe drug overdose, and after she was placed in a jail cell and left to suffer until she vomited, became unconscious, and stopped breathing, all demonstrated malice and willful and wanton and reckless disregard for her safety. Conduct that exceeds the scope of authority or that shows such malice and willful or wanton or reckless disregard for a pre-trial detainee pierces the shield of public officer immunity.

87.     As a proximate result of the Defendant BCSO Jail Guards' malicious, willful, wanton, and reckless conduct, Smiley suffered agonizing pain and humiliating abandonment. until she died.

88.     Plaintiff, in her capacity as Administrator of the Estate, is entitled to recover from Defendant Duncan and the Defendant BCSO Jail Guards, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for

10

pain and suffering and humiliation that Smiley experienced in time before her death.

89.　Plaintiff also seeks and is entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendant Duncan and the Defendant BCSO Jail Guards, jointly and severally. The actions of the Defendant BCSO Jail Guards showed actual malice toward Smiley and willful and wanton and reckless disregard for her safety.

**SECOND CAUSE OF ACTION**
**WRONGFUL DEATH: DEFENDANT MILLER**
**AND DEFENDANT SECMG**

90.　All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

91.　Defendant Miller did not comply with the accepted standards of care for her healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein.

92.　Defendant Miller is liable and was negligent in at least the following respects:

a.　Failing to provide appropriate medical treatment to Smiley and/or failing to contact emergency medical services after Smiley reported to Miller, during the booking process, that she had swallowed "a lot" of "meth:"

b.　Failing to provide appropriate medical treatment to Smiley and/or failing to contact emergency medical services after Smiley showed signs of experiencing a severe drug overdose while she was being processed; and

c.　Otherwise failing to comply with the accepted standards of care for her healthcare profession in the same or similar communities.

93.　As a proximate result of Defendant Miller's negligence, Smiley suffered agonizing pain and humiliating abandonment, until she died.

94.　A person of ordinary intelligence and prudence could have foreseen that death would be the probable result of the failure to provide proper medical care to a person who had ingested an unknown dosage of methamphetamine.

95.　SECMG is liable, under the doctrine of *respondeat superior*, for the medical negligence of its agent, Defendant Miller, in providing healthcare to Smiley.

96.　SECMG also failed to adhere to the medical care plan submitted to and approved by County officials, as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001, because the nursing staff, including Defendant Miller, was not supervised by a licensed physician, exceeding the scope of their licensure and constituting negligent supervision.

11

97.     Plaintiff, in her capacity as Administrator of the Estate, is entitled to recover from Defendants Miller and SECMG, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Smiley experienced in time before her death.

98.     Plaintiff also seeks and is entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendants Miller and SECMG, jointly and severally. The actions of Defendant Miller showed actual malice toward Smiley and willful and wanton and reckless disregard for her safety. Defendant Miller was the managing agent for SECMG in the jail, subjecting SECMG to punitive damages.

### THIRD CAUSE OF ACTION
### FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:
### DEFENDANT DUNCAN, DEFENDANT WILHELM,
### AND THE DEFENDANT BCSO JAIL GUARDS

99.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

100.    All Defendants except the Surety are "persons." and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

101.    The rights of pre-trial detainees and the conduct of Defendant Duncan. Defendant Wilhelm, and the Defendant BCSO Jail Guards towards Smiley are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

102.    The practice in the jail of systematically failing to place Smiley on a four-times-per-hour direct observation watch as required by North Carolina law [10A NCAC 14J.0601(c)] violated the standard of objective reasonableness.

103.    Further, the specific acts and omissions of the Defendant BCSO Jail Guards and Defendant Wilhelm complained of herein were objectively unreasonable and violated Smiley's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

104.    Defendant Duncan and Defendant Wilhelm also failed to train their detention facility officers and other agents in recognizing and properly responding to a methamphetamine overdose, which also violates the standard of objective reasonableness. Defendants Duncan and Wilhelm are sued in their official capacities for these Fourteenth Amendment violations, as they stem from a systematic practice of not properly training the jail's detention officers on how to attend to the urgent medical needs of detainees who have overdosed on methamphetamines, as required by law.

105.    Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference. These included the acts of failing to provide

12

appropriate medical treatment, failing to contact emergency medical services. and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

106. Further, Smiley was detained under conditions that posed a substantial risk of serious harm, and the Defendant BCSO Jail Guards knew of and disregarded those risks to Smiley's health and safety, including hearing, seeing, and ignoring her condition of overdosing on methamphetamines, which violated Smiley's Fourteenth Amendment rights.

107. Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions complained of herein showed reckless disregard and open contempt for Smiley's well being. satisfying the deliberate indifference standard.

108. The Defendant BCSO Jail Guards and Defendant Wilhelm had actual and constructive knowledge of Smiley's serious medical condition but were deliberately indifferent to Smiley's need for critical and essential assessment and medical treatment.

109. Further the Defendant BCSO Jail Guards and Defendant Wilhelm are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

110. The actions of these same individual Defendants so violated the standards of decency as to shock the conscience of the community and thus violated substantive due process also protected by the Fourteenth Amendment.

111. As a result of these violations by Defendant Duncan, Defendant Wilhelm, and the Defendant BCSO Jail Guards, Smiley suffered an agonizing death under inhumane conditions and was left to die in her jail cell.

112. Plaintiff seeks and is entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendant Sheriff Duncan, Defendant Wilhelm, and the Defendant BCSO Jail Guards, including but not limited to damages for the pain and suffering and humiliation that Smiley experienced in the time before her death.

113. Defendant Sheriff Duncan and Defendant Wilhelm are liable for supervisory liability, due to the practices at the jail of not properly training its detention officers on how to attend to the urgent medical needs of detainees who have overdosed on methamphetamines and not properly monitoring pre-trial detainees who have overdosed on methamphetamines, as required by law. There was a causal link between the willful and wanton indifference to these training and monitoring deficiencies and Smiley's death.

114. Plaintiff also seeks and is entitled to punitive damages from the Defendant BCSO Jail Guards individually, as allowed under 42 U.S.C. § 1983, due to the Defendant BCSO Jail Guards' reckless indifference to Smiley's federally protected rights.

## FOURTH CAUSE OF ACTION
## FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:
## DEFENDANT MILLER AND DEFENDANT SECMG

115.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

116.    Defendants Miller and SECMG are "persons," and her actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

117.    The rights of pre-trial detainees and the conduct of Defendants Miller and SECMG towards Smiley are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

118.    The specific acts and omissions of Defendant Miller complained of herein, which are imputed to Defendant SECMG, were objectively unreasonable and violated Smiley's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment and failing to contact emergency medical services after Smiley had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

119.    Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference. These included Defendant Miller's acts of failing to provide appropriate medical treatment and failing to contact emergency medical services after Smiley had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

120.    Further, Smiley was detained under conditions that posed a substantial risk of serious harm, and Defendant Miller knew of and disregarded those risks to Smiley's health and safety, including hearing, seeing, and ignoring her condition of overdosing on methamphetamines, which violated Smiley's Fourteenth Amendment rights.

121.    Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions of Defendant Miller complained of herein showed reckless disregard and open contempt for Smiley's well being, satisfying the deliberate indifference standard.

122.    Defendant Miller had actual knowledge of Smiley's serious medical condition but was deliberately indifferent to Smiley's need for critical and essential assessment and medical treatment.

123.    Defendant Miller is sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

124.    The actions of Defendant Miller, which are imputed to Defendant SECMG, so violated the standards of decency as to shock the conscience of the community and thus violated substantive due process also protected by the Fourteenth Amendment.

14

125.     As a result of these violations by Defendants Miller and SECMG, Smiley suffered an agonizing death under inhumane conditions.

126.     Plaintiff seeks and is entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendants Miller and SECMG, including but not limited to damages for the pain and suffering and humiliation that Smiley experienced in the time before her death.

127.     Plaintiff also seeks and is entitled to punitive damages as allowed under 42 U.S.C. § 1983, due to Defendant Miller's reckless indifference to Smiley's federally protected rights.

## FIFTH CAUSE OF ACTION
## ACTION UNER THE BOND

128.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

129.     The actions of Defendant Sheriff Duncan and Defendant Wilhelm, both the systemic failure to train its detention officers and to monitor pre-trial detainees, and the discrete, described acts of the Defendant BCSO Jail Guards constituted neglect and malfeasance in their employment with Sheriff Duncan and were taken under the auspices of the office of the Sheriff. As a proximate result, decedent suffered intense mental and physical pain and died.

130.     Further, the negligence of the SECMG Defendants should be covered by the Bond, as those Defendants were acting under the non-delegable authority of the Sheriff at all times. As a proximate result, decedent suffered intense mental and physical pain and died.

131.     Plaintiff brings this action for wrongful death on the Sheriff's bond pursuant to N.C.G.S. § 58-76-5.

132.     Plaintiff, in her capacity as Administratrix of the Estate, is entitled to recover on the bond all damages for wrongful death caused by the neglect and malfeasance of the Sheriff and his agents, as allowed by N.C.G.S. § 28A-28-2(b). Such damages are in excess of $25,000.00. She may sue repeatedly on the bond until the judgment is paid.

## SIXTH CAUSE OF ACTION
## N.C.G.S. § 162-55

133.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

134.     The actions and omissions of the Defendant BCSO Jail Guards showed such reckless indifference and thoughtless disregard for Smiley's safety, and caused Smiley injury, such that Plaintiff is entitled to recover treble the compensatory damages awarded to the Estate from them, pursuant to N.C.G.S. § 162-55. Under the case law, such reckless indifference is equivalent to criminal neglect.

## SEVENTH CAUSE OF ACTION
## N.C.G.S. § 162-50

135.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

136.    The actions and omissions of the Defendant BCSO Jail Guards, imputed to Sheriff Duncan under the principle of *respondeat superior*, constituted willful failure or neglect to perform duties imposed upon them, entitling Plaintiff to a penalty of five hundred dollars ($500.00) under N.C.G.S. § 162-50, in addition to all other remedies sought herein.

## JURY DEMAND

137.    Plaintiff requests that all issues be tried before a jury of her peers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, as Administratrix of the Estate, upon the trial of this matter before a jury, prays that the Court enter judgment for Plaintiff and order the following relief:

1.    Judgment against Defendant Sheriff Duncan and Defendant Wilhelm officially and against the Defendant BCSO Jail Guards individually for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

2.    Judgment against Defendant Miller and Defendant SECMG, jointly and severally, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

3.    Judgment against Defendant Sheriff Duncan officially, against Defendant Wilhelm officially and individually, and against the Defendant BCSO Jail Guards individually under 42 U.S.C. § 1983 for compensatory damages.

4.    Judgment against the Defendant BCSO Jail Guards individually under 42 U.S.C. § 1983 for punitive damages.

5.    Judgment against Defendant Miller and Defendant SECMG, jointly and severally, under 42 U.S.C. § 1983 for compensatory damages and punitive damages.

6.    An award of treble the compensatory damages against the Defendant BCSO Jail Guards and Defendants Miller and SECMG under N.C.G.S. § 162-55.

7.    An Order that Defendants pay Plaintiff's costs as allowed under North Carolina law and 42 U.S.C. § 1988, including reasonable attorneys' fees.

8.    That the Court grant such other and further relief as it deems equitable and just.

16

Respectfully submitted, this the 2nd day of October, 2018.

_(signature)_

George B. Hyler, Jr.
NC Bar No. 5682
Stephen P. Agan
NC Bar No. 35763
Hyler & Lopez, P.A.
38 Orange Street
Asheville, NC 28801
(828) 254-1070
*Attorneys for Plaintiff*

_(signature)_

John M. Olesiuk
NC Bar No. 13637
B. Todd Lentz
NC Bar No. 27941
DeVere Lentz & Associates
17 N. Market Street
Asheville, NC 28801
(828) 258-1441
*Attorneys for Plaintiff*

17

700

DETENTION HEALTH PLAN

RECEIVING SCREENING

702E

A. **STANDARDS AND STATUTES:**

    1.  State Statutes:        G.S. 153A-221

    2.  State Standards:      10 NCAC 14J Section .1001; .1002

    3.  NCCHC Standards:   J-E-02 (Essential)

    4.  BCDF Policy:       706

B. **OBJECTIVE:** To protect the health and well-being of the inmate and the community through the early detection and appraisal of the health status of the arriving inmate. To identify any potential emergency situation among arrestees arriving at the BCDF. Also, to establish baseline data for the use in subsequent care and treatment of the inmate and to furnish data for appropriate classification and housing.

C. **POLICY:** A Medical Receiving Screening will be performed by Detention Staff upon arrival of each detainee into the Booking Area. This will be done in the JMS Computer System and the screening form will be completed by the Booking Officer. Any observable illness/injury requires an immediate confidential health assessment of the detainee by qualified health care personnel. Arrestees who are unconscious, semi-conscious, bleeding, unstable, or urgently in need of medical attention are referred immediately for emergency care. All other inmates will have a Medical Receiving Screening Form completed by the Booking Officer prior to being classified for housing in the BCDF. The Medical Staff will review the Medical Receiving Screening Form daily and complete their review and assessment within 24 hours.

The minimal areas that the Medical Receiving Screening Form will cover are:

    1.  Inquiry into current illnesses and health problems including sexually transmitted disease; medications taken; special health requirements (including dietary); use of alcohol and other drugs including types of drugs used, mode of use, amounts and frequency, date and time of last use, and a history of problems that occurred after ceasing use, i.e. convulsions; allergies; dental problems; and any other health problem designated by the RHE.

3



2. Observation of behavior which includes state of consciousness, mental status, appearance, conduct, tremors and sweating, body deformities, ease of movement, etc; condition of skin, including trauma, markings, bruises, lesions, jaundice, rashes and infestations, needle marks or other indications of drug use.

3. History of tuberculosis or other infectious or communicable illness, (i.e. HIV/STD), or symptoms suggestive of such illnesses (i.e., chronic cough, hemoptysis, lethargy, weakness, weight loss, loss of appetite, fever, night sweats).

4. Inquiry into mental health status especially suicidal ideation and current medications and/or agency currently providing mental health care.

5. Inquiry into pregnancy for all women.

6. When clinically indicated, immediate referral is made to the appropriate health care agency in the community and noted in the inmate's medical record. Should the inmate be placed in general population and a later referral be indicated, documentation of the date, time, and location of referral is made in the inmate's medical record.

7. Upon medical review, the Classification Division will be notified if the inmate is cleared for General Population.

8. Upon admission, the Medical Staff will be notified of any medications that may have been brought in by the inmate. These medications will be reviewed and properly administered according to the medication schedule the inmate was following before admission.

D. **PROCEDURE:**

1. Upon arrival at Intake, prior to accepting custody of an arrestee from the arresting officer, the Intake Officer will visually observe the arrestee for illness or injury. Any apparent illness or injury or positive response from the arrestee will require assessment by the Intake Officer before accepting custody. Based upon the opinion of the Booking Supervisor, custody can be refused until the arresting officer obtains medical treatment for the arrestee and returns with a written statement from the examining physician stating that the arrestee is medically fit for confinement.

2. A full medical receiving screening will be performed by medical staff for all new inmates during the initial booking procedure at the BCDF. If the inmate has been through the medical screening in the last 90 days they will not be seen again.

3. Any arrestee identified as having pulmonary tuberculosis disease or who is HIV+ with open lesions or who is assaultive will be isolated from the general population until transfer of the inmate can be arranged. The County Department of Health and

4

County Safety Officer will be notified of all inmates testing positive for tuberculosis so that appropriate follow-up can be arranged.

4. Any inmate identified as being suicidal will be placed on the Special Watch Level appropriate for the inmate's need (Level 1 or 2). Special Watch means visual observation by detention staff four times per hour on an irregular basis.

5. Any arrestee identified as being at risk for delirium tremors due to alcohol withdrawal should be monitored closely by medical staff (Medical Watch) for hallucinations, confusion, disorientation, tremors, etc.

6. All injuries and/or signs of trauma are documented in the inmate's chart and followed-up by medical staff or referred to the appropriate agency in the community.

700

DETENTION HEALTH PLAN

EMERGENCY SERVICES

708E

A. **STANDARDS AND STATUTES:**

    1. State Statutes:        G.S. 153A-225

    2. State Standards:      10 NCAC 14J Section .1001

    3. NCCHC Standards:    J-E-08 (Essential)

B. **OBJECTIVE:** To provide for adequate emergency services on a 24-hour basis for acute medical and psychiatric conditions.

C. **POLICY:** The RHE, in consultation with the Facility Director, will generate procedures to assure that emergency medical and psychiatric services are provided by the BCDF with efficiency and expediency on a 24-hour basis.

D. **PROCEDURE:**

    1. Qualified health care providers will be onsite and available at the BCDF on a 24-hour basis.

    2. Emergency transportation is available for an inmate from the facility when a condition exists that exceeds the medical capabilities of the BCDF.

    3. Use of a community emergency medical vehicle for the transfer of the inmate to Mission Hospital Emergency Room or other local hospital is available.

    4. Physician or physician extender on-call coverage is available on a 24-hour basis.

    5. Security procedures are in place to provide for the immediate transfer of the inmate when appropriate.

    6. BCDF staff have immediate access to phone numbers of all health care personnel and available community resources.


PLAINTIFF'S EXHIBIT

700

DETENTION HEALTH PLAN

INTOXICATION AND
WITHDRAWAL

706G

A. **STANDARDS AND STATUTES:**

    1. State Statutes:        G.S. 153A-221

    2. State Standards:     · 10A NCAC 14J Section .0601; .1001

    3. NCCHC Standards:    J-G-06 (Essential)

B. **OBJECTIVE:** To provide written policies and procedures to manage inmates who may be intoxicated or experiencing withdrawal from alcohol or other drugs.

C. **POLICY:** The responsible Health Authority shall define and approve written policy, procedures, and specific protocols to manage BCDF inmates under the influence of alcohol and drugs or undergoing withdrawal consistent with local, state and federal laws which shall include:

    1.    How to recognize intoxication and withdrawal;

    2.    Observation procedures;

    3.    Emergency, life-threatening situation guidelines;

    4.    Treatment protocols for the most common intoxicants; and

    5.    Training needs for detention and medical personnel.

D. **DETOXIFICATION:** Broadly defined, detoxification - refers to the withdrawal of a drug to which a person is physically dependent and/or treatment of the condition that result from the withdrawal of the drug (the abstinence syndrome). Usually another drug is used to treat the consequences of withdrawal.


PLAINTIFF'S EXHIBIT 3

# STATE OF NORTH CAROLINA

_____Buncombe_____ County

| | |
|---|---|
| *Name Of Plaintiff* <br> Irene Warren Kent | |
| *Address* <br> c/o Hyler & Lopez, PA / 38 Orange Street | |
| *City, State, Zip* <br> Asheville, NC 28801 | |

**VERSUS**

*Name Of Defendant(s)*

Van Duncan; Western Surety Company; Charles J. Wilhelm;
Edward F. Parker; Meghan T. Riddle; Ryan P. Zabloudil; Matthew
C. Corn; Ethan Gibbs; John Doe #1; John Doe #2; Tina Cox Miller,
LPN; and Southeast Correctional Medical Group, PLLC

**To Each Of The Defendant(s) Named Below:**

▶ *File No* **18CV 04471**

In The General Court Of Justice
☐ District  ☒ Superior Court Division

# CIVIL SUMMONS
☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

| *Name And Address Of Defendant 1* <br> Meghan T. Riddle <br> 61 Mulberry Ct <br> Arden, NC 28704-2732 | *Name And Address Of Defendant 2* |
|---|---|

⚠ **IMPORTANT! You have been sued! These papers are legal documents, DO NOT throw these papers out!
You have to respond within 30 days. You may want to talk with a lawyer about your case as soon as
possible, and, if needed, speak with someone who reads English and can translate these papers!**

**¡IMPORTANTE! ¡Se ha entablado un proceso civil en su contra! Estos papeles son documentos legales.
¡NO TIRE estos papeles!
Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible
acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos
documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1.  Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been
    served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2.  File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)* <br> George B. Hyler, Jr. <br> Hyler & Lopez, PA <br> 38 Orange Street <br> Asheville, NC 28801 | *Date Issued* 10-3-18 | *Time* 9:39 ☒ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

| ☐ **ENDORSEMENT (ASSESS FEE)** <br> This Summons was originally issued on the date indicated <br> above and returned not served. At the request of the plaintiff, <br> the time within which this Summons must be served is <br> extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ *Deputy CSC* | ☐ *Assistant CSC* | ☐ *Clerk Of Superior Court* |

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or
less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if
so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 4/18
© 2018 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| 10-15-2018 | 1:16 | ☐ AM ☒ PM | Meghan Riddle |

☒ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | | Name Of Defendant |
|---|---|---|---|
| | | ☐ AM ☐ PM | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid | Signature Of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name Of Sheriff (type or print) |
| 10-3-18 | Steven Cogburn CSC |
| Date Of Return | County Of Sheriff |
| 10-15-18 | |

AOC-CV-100, Side Two, Rev. 4/18
© 2018 Administrative Office of the Courts