UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:18 CV 322

| | | |
|---|---|---|
| IRENE WARREN KENT, Administratrix of the Estate of Michele Quantele Smiley, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | |
| VAN DUNCAN, in his official capacity as Sheriff of Buncombe County; WESTERN SURETY COMPANY, as surety for the Sheriff; CHARLES J. WILHELM, in his official and individual capacity; JEFFREY LEON LITTRELL, in his official and individual capacity; THOMAS CHRISTOPHER ("CHRIS") BARBER, in his official and individual capacity; RYAN PATRICK ZABLOUDIL, in his official and individual capacity; MICHAEL CORN, in his official and individual capacity; EDWARD F. PARKER, in his official and individual capacity; MEGHAN T. RIDDLE, in her official and individual capacity; TINA COX MILLER, LPN; and SOUTHEAST CORRECTIONAL MEDICAL GROUP, PLLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **PLAINTIFF'S SECOND AMENDED COMPLAINT** |
| Defendants. | ) ) | |

NOW COMES the Plaintiff, complaining of the Defendants, and files this Second Amended Complaint, with consent of the opposing parties pursuant to Federal Rule of Civil Procedure 15(a)(2), and alleges and says:

## PARTIES & JURISDICTION

1.     Plaintiff Irene Warren Kent, a citizen and resident of Buncombe County, is bringing this action in her capacity as the duly-appointed Administratrix of the Estate of her deceased granddaughter, Michele Quantele Smiley, who died on October 6, 2017 while in custody of Defendant Van Duncan and his officers in the Buncombe County Detention Facility.

2.     On October 6, 2017, Defendant Van Duncan ("Duncan" or "Sheriff Duncan") was the elected Sheriff of Buncombe County, charged by statute with control and operation of the

Buncombe County Detention Facility (sometimes, the "jail"). At all times relevant to this Complaint, Sheriff Duncan had custody of the jail under N.C.G.S. § 162-22, had a non-delegable responsibility for the maintaining adequate supervision of the jail under N.C.G.S. § 162-24, and was the final policymaker for the jail for purposes of 42 U.S.C. § 1983.

3.     Sheriff Duncan's legal obligations include the specific duty under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees in order "to be at all times informed of the prisoners' general health and emergency medical needs." He is sued in his official capacity under N.C.G.S. § 58-76-5 and N.C.G.S. § 153A-435. He is also sued officially as the final policymaker responsible for the unlawful practices at the jail. Those practices include the systematic failure to immediately refer arrestees who are in urgent need of medical attention for emergency care and the systematic failure to supervise pre-trial detainees in accordance with correctional standards and state law and regulation, practices that led to the death of Smiley. Those practices also include the failure to provide sufficient competency-based training for his detention facility officers and other agents in recognizing an inmate-needed immediate medical intervention, including recognizing and properly responding to drug overdose, a practice that also lead to the death of Smiley. Those practices also include the failure to conduct a complete and thorough investigation into the in-custody death of Smiley, which resulted in an inadequate investigation and the ratification of his detention staff's and medical staff's conduct proximately resulting in Smiley's death. Those practices, taken under color of law, were objectively unreasonable and deliberately indifferent and shocking to the conscience, violating Smiley's Fourteenth Amendment right to due process and were a proximate cause of her death.

4.     Defendant Western Surety Company is a South Dakota company and sued as the Sheriff's surety under N.C.G.S. § 58-76-5. Upon information and belief, Western Surety Company issued the statutorily mandated surety bond to cover any injury caused by the neglect or misconduct of the Sheriff or those he employs. On October 6, 2017, Sheriff Duncan was obligated under state law to obtain and maintain said surety bond and by doing so, waived sovereign immunity as to the claims in this matter, at least to the extent of the bond.

5.     Upon information and belief, Sheriff Duncan, through Buncombe County, has waived governmental or sovereign immunity from the state law tort claims in this case pursuant to N.C.G.S. § 153A-435, either by participation in a government risk pool or through purchase of commercial insurance that will indemnify him for any judgment against him or his employees named in this action.

6.     Further, N.C.G.S. § 153A-224 imposes an affirmative statutory duty upon Sheriff Duncan and his jail employees to provide continuous custodial supervision of all persons in custody and "to be at all times informed of the prisoners' general health and emergency medical needs." The violation of this mandatory statutory duty to keep each prisoner "protected" is a misdemeanor and creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

7.     Further, N.C.G.S. § 162-55 imposes an affirmative statutory duty upon Sheriff Duncan and his jail employees to refrain from "do[ing], or caus[ing] to be done, any wrong or injury to the prisoners committed to his custody, contrary to law." The violation of this mandatory

statutory duty is also a misdemeanor and also creates an exception to, and precludes application of, the doctrine of governmental immunity to the tort claims in this case.

8. Further, the defense of governmental or sovereign immunity as a defense to Plaintiff's state law tort claims has been expressly waived, upon information and belief, by Buncombe County's adoption of a resolution that deems the creation of its funded reserve to be the same as the purchase of insurance under N.C. Gen. Stat. § 153A-435(a).

9. Defendant Charles J. Wilhelm (hereinafter, "Wilhelm") was employed by Sheriff Duncan as a Lieutenant Facility Administrator and was on duty at the jail that day on October 6, 2017. Upon information and belief, Sheriff Duncan assigned Defendant Wilhelm supervisory responsibility for the jail and either made Wilhelm a "keeper" of the jail under N.C.G.S. § 162-22 or identified him under N.C.G.S. § 162-24 to assist Sheriff Duncan in operating the jail. Defendant Wilhelm was working at the Buncombe County Detention Facility on October 6, 2017, and is sued in his official capacity for his failure keep continuous custodial supervision of Smiley, including failing to keep Smiley under special watch, and is sued in his individual and official capacity for violation of Smiley's Fourteenth Amendment rights.

10. Defendant Jeffrey Leon Littrell (hereinafter, "Littrell") was employed by Sheriff Duncan as a Lieutenant Facility Administrator and was on duty at the jail that day on October 6, 2017. He is currently a resident of Henderson County, North Carolina. He is sued in his official and individual capacity. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Littrell. Thus, he is liable in his official capacity for his negligence.

11. Defendant Thomas Christopher ("Chris") Barber (hereinafter, "Barber") was employed by Sheriff Duncan as a Lieutenant Facility Administrator and was on duty at the jail on October 6, 2017. He is currently a resident of Henderson County, North Carolina. He is sued in his official and individual capacity. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Barber. Thus, he is liable in his official capacity for his negligence. Defendant Barber resigned from employment with the Buncombe County Sheriff's Office since the incident that is the subject of this Complaint.

12. Defendant Ryan Patrick Zabloudil (hereinafter, "Zabloudil") was employed on by Sheriff Duncan as a Sergeant Shift Supervisor was on duty at the jail October 6, 2017. He is currently a resident of Buncombe County, North Carolina. He is sued in his official and individual capacity. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Zabloudil. Thus, he is liable in his official capacity for his negligence.

13. Defendant Michael Corn (hereinafter, "Corn") was employed by Sheriff Duncan as a Detention Officer and was on duty at the jail on October 6, 2017. He is currently a resident of

3

Henderson County, North Carolina. He is sued in his official and individual capacity. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Corn. Thus, he is liable in his official capacity for his negligence. Defendant Corn resigned from employment with the Buncombe County Sheriff's Office since the incident that is the subject of this Complaint.

14. Defendant Edward F. Parker (hereinafter, "Parker") was employed by Sheriff Duncan as a Detention Officer and was on duty at the jail on October 6, 2017. He is currently a resident of Cherokee County, State of Georgia. He is sued in his official and individual capacity. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from the North Carolina common law claims against Defendant Parker. Thus, he is liable in his official capacity for his negligence. Defendant Parker retired from employment with the Buncombe County Sheriff's Office since the incident that is the subject of this Complaint.

15. Defendant Meghan T. Riddle (hereinafter, "Riddle") was employed by Sheriff Duncan as a Detention Officer and was on duty at the jail on October 6, 2017. Upon information and belief, Defendant Riddle is a resident of Buncombe County, North Carolina. She is sued in her individual and official capacities. The surety bond, the risk pool, or commercial insurance obtained, and the statutory duty referred to in the previous paragraphs, waive or overcome any claim to public officer immunity from these claims against these Defendants. Thus, she is liable in her official capacity for her negligence.

16. To the extent Defendants Wilhelm, Littrell, Barber, Zabloudil, Corn, Parker, and/or Riddle assert public officer immunity, they are sued individually for conduct outside the scope of their authority and for malicious, willful and wanton disregard for the rights and safety and dignity of Plaintiff's decedent, including failing to provide appropriate medical treatment, failing to keep Smiley under special watch, failing to contact emergency medical services, and/or failing to transport Smiley to the hospital emergency department after Smiley reported that she had swallowed "a lot" of "meth" while she was being processed and showed signs of a severe drug overdose; placing Smiley in a jail cell and leaving her there to suffer until she became unconscious and stopped breathing; standing outside of her jail cell and watching her lie motionless and continuing to fail to provide appropriate medical treatment, to contact emergency medical services, and/or to transport Smiley to the hospital emergency department; and the systematic avoidance of required in-person cell checks. Such conduct violates their statutory duty under N.C.G.S. § 153A-224 to ensure continuous supervision of inmates and "to be at all times informed of the prisoners' general health and emergency medical needs," and pierces the shield of public officer immunity.

17. At all times relevant to this Complaint, Defendant Tina Cox Miller ("Miller") was a licensed practical nurse (LPN) who was employed by SECMG to provide nursing services in the Buncombe County jail. She is currently a resident of Buncombe County, North Carolina.

18. Defendant Southeast Correctional Medical Group, PLLC ("SECMG") is a professional limited liability company with its principal office in the State of Georgia. According to its website, it provides healthcare services in 110 facilities in more than 60 counties in 7 states,

4

and cares for more than 26,000 inmates daily. SECMG is sued under the doctrine of *respondeat superior* for the negligence of its agent, Defendant Miller.

19.    At all times relevant to this Complaint, SECMG had contracted with the Sheriff of Buncombe County to provide medical care for persons detained in the Buncombe County jail pursuant to a medical care plan submitted to and approved by Buncombe County officials as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001.

20.    Attached hereto and marked **Plaintiff's Exhibit 1** and incorporated by reference is Section 702E of the Detention Health Plan in effect on October 6, 2017, which provides: "Arrestees who are unconscious, semi-conscious, bleeding, unstable, or urgently in need of medical attention are referred immediately for emergency care."

21.    Attached hereto and marked **Plaintiff's Exhibit 2** and incorporated by reference is Section 708E of the Detention Health Plan in effect on October 6, 2017, which provides: "Emergency transportation is available for an inmate from the facility when a condition exists that exceeds the medical capabilities of the [Buncombe County Detention Facility]."

22.    Attached hereto and marked **Plaintiff's Exhibit 3** and incorporated by reference is Section 706G of the Detention Health Plan in effect on October 6, 2017, which provides: "The responsible Health Authority shall define and approve written policy, procedures, and specific protocols to manage [Buncombe County Detention Facility] inmates under the influence of alcohol and drugs . . . consistent with local, state and federal laws which shall include . . . 3. Emergency, life-threatening situation guidelines[.]"

23.    Based on SECMG's contract to provide medical care to inmates at the Buncombe County Detention Facility pursuant to a medical plan required by state statute and regulation, SECMG is a "person" acting under color of law for purposes of 42 U.S.C. § 1983. It is sued for violating the Fourteenth Amendment rights of the decedent in failing to provide her adequate medical care while in pretrial custody.

24.    SECMG is also sued under state law for the wrongful death of Plaintiff's decedent by failing to adequately supervise decedent's medical care and allowing SECMG employees and agents to exceed the scope of their medical licenses, which proximately led to her death.

25.    Defendant Miller is a "person" who was acting under color of state law for purposes of 42 U.S.C. § 1983 in providing medical services in the Buncombe County Detention Facility pursuant to state law and regulation. Her actions and omissions violated decedent's Fourteenth Amendment right to reasonably adequate medical care while in pre-trial custody. She is sued individually under § 1983.

26.    Further, the actions and omissions of Defendant Miller were so outrageous as to shock the conscience of the community and violate Smiley's right to substantive due process.

27.    Defendant Miller is also sued under state law for wrongful death, as she owed a duty of care to Smiley and violated the standards of medical care applicable to licensed practical

nurses, including exceeding the scope of her license by providing inadequate medical care without proper supervision by a licensed physician, and her breach of that standard of care and duty owed proximately caused the death of Plaintiff's decedent.

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

## FACTS

29.     On October 6, 2017, at approximately 11:46 a.m., Michele Smiley began the process of being booked into the Buncombe County jail, after she was arrested for probation violations that included: 1) failing to report for appointments with her probation officer, 2) not being at her residence on four different occasions after 6:00 p.m., in violation of a curfew condition, and 3) failing to report for a substance abuse assessment.

30.     Defendant Parker was the "Booking Officer" and Defendant Riddle was the "Search Officer" during the booking process, as indicated in the relevant documentation.

31.     At about 11:17 a.m., Smiley was brought into the North Intake Area of the Buncombe County Detention Facility by three Probation/Parole Officers from the North Carolina Department of Public Safety, including Officer Lacey McKinney.

32.     At about 11:20 a.m., Smiley was searched while handcuffed by Defendant Riddle. Smiley was wearing dark sweatpants and a dark sweatshirt/hoodie. Smiley's metal handcuffs were removed at about 11:22 a.m. by Officer McKinney.

33.     At about 11:50 a.m., Smiley was taken through two security doors into the North Booking Area by Defendant Corn, and was then provided a tray of lunch by Defendant Parker. Smiley took a sip of the drink on the tray, but was not able to eat anything and, a minute later, handed the lunch tray to Defendant Riddle.

34.     At about 11:52 a.m., Smiley removed her shoes, stood up, and was searched by Defendant Riddle. Upon information and belief, Smiley was then scanned with a metal detector and her picture was taken by Defendant Riddle.

35.     Upon information and belief, Smiley then told Defendant Riddle that she had swallowed something so that her probation officer wouldn't find it on her. Soon after hearing that information, Defendant Riddle called for a nurse.

36.     At about 11:57 a.m., it is believed that Defendant Riddle told Smiley to try to eat some of her lunch. Smiley took her lunch tray and sat back down into a chair in the North Booking Area, but again was not able to eat anything.

37.     At that point, Smiley was alert and verbal but started to become visibly distressed, loosening her sweatshirt collar and pulling her hair back.

6

38.     Defendant Miller then came to the North Booking Area and found Smiley sitting in a chair.  Miller asked Smiley what was going on, and Smiley told her that she had "taken something" and that she "did not need to be here."

39.     Defendant Miller began to check her and noted that she had the smell of alcohol on her breath.  Smiley stated that she drank alcohol earlier.

40.     While attempting to eat lunch, Smiley repeated several times, "I can't do this," and, "I don't feel right," and put her lunch tray down.  After taking a bite of her sandwich, and a small drink of juice, Smiley held the bite of sandwich in her left jaw, which she later spit out in the toilet.

41.     Defendant Miller asked Smiley several times what she had taken.  Smiley first said that it was "a powder broken up" and "there may have been something pink in it."  Defendant Miller asked if it was Meth that she had swallowed.  Smiley said "I don't know," and "I don't know what they gave me," and then stated that it was "Meth."

42.     Defendant Miller asked Smiley how she took it and Smiley stated that she "ate it." Defendant Miller then asked Smiley how much she had swallowed and Smiley said, "I don't know, just a lot."

43.     Upon information and belief, Defendant Corn, Defendant Riddle, and Defendant Parker were in the North Booking Area and either overheard this conversation between Smiley and Defendant Miller or were soon informed about it.

44.     Defendant Miller then turned to Defendant Corn and asked him if Smiley was booked into the jail and stated to him, "I would not take her."

45.     Defendant Corn then stated that it was "too late" and that she "already had her blue papers" and the officers that brought her were "gone."

46.     At that point, Defendant Miller, Defendant Corn, Defendant Riddle, and Defendant Parker all knew that Smiley had ingested an unknown quantity of methamphetamine.

47.     Upon information and belief, the video footage of the time when Defendant Miller first encountered Smiley in the North Booking Area and when Smiley told her and other Defendants that she had swallowed "a lot" of methamphetamine has been <u>deleted</u> by someone with access to the master video files at the Buncombe County Detention Facility.

48.     At the time of this pleading, no video footage has been produced by the Defendant Sheriff for the time period between 11:58:10 through 12:02:49, which is a 4 minute and 39 second time period.

49.     After Smiley told Defendant Miller that she had swallowed "a lot" of methamphetamine, Smiley was visibly distressed and showed signs of agitation, restlessness, and irritability, and was constantly moving and unable to sit still.  Smiley stated to Defendant Miller that she "was burning up," and she was repeatedly pulling at her hoodie sweatshirt.

7

50.     Neither Defendant Miller, nor Defendant Corn, nor Defendant Riddle, nor Defendant Parker, who were all present with Smiley up until that time, called for emergency medical services or requested authorization from the director of the jail to immediately transfer Smiley to the hospital, after Smiley: was visibly distressed; had said that she had swallowed "a lot" of methamphetamine; showed signs of agitation, restlessness, and irritability; had stated that she "was burning up;" and was repeatedly pulling at her hoodie while sitting in a chair in the Second Floor North Booking Area of the jail.

51.     Just prior to 12:03 p.m., Smiley was taken down the hall to the bathroom by Defendant Miller accompanied by Defendant Parker. Smiley walked to the bathroom with an unsteady gait. Defendant Miller went into the bathroom with Smiley, who then spit out part of her sandwich in the toilet.

52.     In the bathroom, Smiley began having extreme anxiety that was increasing steadily, and she was pacing back and forth from wall to wall to the sink. Smiley attempted to vomit in the bathroom, but could not.

53.     A female officer or nurse then entered the bathroom with Smiley and Defendant Miller. Defendant Corn then brought a lighter shirt over to the bathroom and handed it to someone. Smiley took off her sweatshirt and put on the light shirt.

54.     While in the bathroom, Smiley became diaphoretic (sweating heavily) and repeatedly splashed cool water from the sink onto her face.

55.     Defendant Miller attempted to help cool Smiley down by applying cool, wet paper towels to her face and the back of her neck. At that point, Smiley's hands were extremely red, with some red dark pink color around her nails at the cuticles.

56.     Defendant Miller encouraged Smiley to "slow down" and "take deep breaths," to which Smiley repeatedly responded: "I can't." Smiley also said: "I just don't feel right."

57.     Just prior to 12:09 p.m., Defendant Miller and Smiley came out of the bathroom. Defendant Miller was holding Smiley's right arm as they walked down the hallway and, at one point, Smiley steadied herself by placing her left hand on the wall. Smiley was sweating heavily and pulling her hair back with her free hand as she walked down the hallway. Defendant Corn was also in the hallway and observed all of this.

58.     Attached hereto and marked **Plaintiff's Exhibit 4** is a screenshot from video footage that has been produced by Defendant Duncan from the hallway showing Defendant Miller assisting Smiley down the hallway from the bathroom.

59.     Neither Defendant Miller, nor Defendant Corn, nor Defendant Parker, nor Defendant Riddle, who were all present with Smiley up until that time, called for emergency medical services or requested authorization from the director of the jail to immediately transfer Smiley to the hospital, after Smiley: was visibly distressed; had said that she had swallowed "a lot" of methamphetamine; showed signs of agitation, restlessness, and irritability; had stated that

8

she "was burning up;" was repeatedly pulling at her hoodie while sitting in a chair in the booking area of the jail; went to the bathroom and began having extreme anxiety, increasing unsteadiness, and was pacing back and forth; attempted to vomit in the bathroom; became diaphoretic (sweating heavily); repeatedly splashed her face with water; said "I can't" when told to "slow down" and "take deep breaths;" said, "I just don't feel right;" and required assistance from Defendant Miller to walk down the hallway.

60.     Defendant Corn told Smiley to "come back and sit down," which she did.  At that point, Smiley was sliding up and down in the chair and constantly moving and was clearly in great physical distress due to an overdose of methamphetamine.  She alternately hunched over and sat back and pulled her hair up.  She wiped the sweat off her hands onto her clothes and was frequently fanning herself with her hand.

61.     Just prior to 12:12 p.m., Defendant Miller wheeled over a blood pressure meter to attempt to obtain Smiley's blood pressure.  Defendant Miller first used a stethoscope placed against Smiley's chest to listen to her heart, but Smiley was barely able to remain still enough for her to do that and lunged forward in obvious distress as soon as the stethoscope was removed.

62.     Defendant Miller then placed the cuff of the blood pressure meter on Smiley's right arm and attempted to obtain her blood pressure.  Smiley was not able to remain still enough in her chair for Miller to take a reading, however, due to the effects of the methamphetamine overdose.  Defendant Miller asked her to be still, but she said, "I can't."  Smiley was sliding up and down in her chair and pulling her hair up with her free hand, clearly in distress.

63.     Just prior to 12:14 p.m., Defendant Corn came over and grabbed Smiley's left forearm and held it still against her body.  Defendant Miller attempted again to take Smiley's blood pressure, while Smiley leaned back and lifted her legs in the air several times, clearly in distress.

64.     Attached hereto and marked **Plaintiff's Exhibit 5** is a screenshot from video footage that has been produced by Defendant Duncan from the North Booking Area showing Defendant Miller attempting to take Smiley's blood pressure while Defendant Corn is holding Smiley's left arm.

65.     At about 12:14:30 p.m., Defendant Riddle came over and assisted by holding down Smiley's left arm.  Defendant Littrell and Defendant Zabloudil also came over to assist.

66.     At about 12:15 p.m., Defendant Miller laced her left leg around Smiley's right leg to hold it down while she continued to attempt to get a blood-pressure reading.  Defendant Zabloudil then reached over and started holding down Smiley's left leg with his right hand.

67.     Attached hereto and marked **Plaintiff's Exhibit 6** is a screenshot from video footage that has been produced by Defendant Duncan from the North Booking Area showing Defendant Miller attempting to take Smiley's blood pressure while Defendant Corn and Defendant Zabloudil assist in holding Smiley still.

9

68.     Upon information and belief, Defendant Zabloudil or Defendant Corn then said to Smiley, "Don't worry, you're not going to die. You're just going to get really high."

69.     Smiley continued to try to fan herself using her left hand, while the Defendants held her down in the chair. At that point, it had been well over 15 minutes since Smiley told Defendant Miller that she had taken "a lot" of methamphetamine and started showing signs of suffering from a drug overdose.

70.     During that 15-minute time period, Smiley: was visibly distressed; had told Defendant Miller that she had swallowed "a lot" of methamphetamine; showed signs of agitation, restlessness, and irritability; had stated that she "was burning up;" was repeatedly pulling at her hoodie while sitting in a chair in the booking area; went to the bathroom and began having extreme anxiety, increasing unsteadiness, and was pacing back and forth; attempted to vomit in the bathroom; became diaphoretic (sweating heavily); repeatedly splashed her face with water; said "I can't" when told to "slow down" and "take deep breaths;" and said, "I just don't feel right;" required assistance from Defendant Miller to walk down the hallway; and went back out into the North Booking Area and was sliding up and down in the chair and constantly moving and was clearly in great physical distress due to an overdose of methamphetamine.

71.     By approximately 12:13 p.m., it was evident to Defendant Miller, Defendant Corn, Defendant Parker, Defendant Riddle, Defendant Littrell, and Defendant Zabloudil that Smiley was undergoing a severe reaction to a methamphetamine overdose. They all knew that she had told Defendant Miller that she had taken "a lot" of methamphetamine. At no time was she belligerent or combative toward any of the Detention Officers or Defendant Miller.

72.     Just after 12:17 p.m., Defendant Littrell came behind Defendant Miller and told her to "get out the away" from Smiley. Defendant Zabloudil then told someone to remove the blood pressure cuff.

73.     Defendant Littrell then said, "She can really fake it," that she has been here several times, and "You can't overdose on meth."

74.     Attached hereto and marked **Plaintiff's Exhibit 7** is a screenshot from video footage that has been produced by Defendant Duncan from the North Booking Area showing Defendant Littrell and Defendant Corn pulling Smiley out of her chair after Defendant Littrell moved Defendant Miller out of the way.

75.     Rather than transporting Smiley to the hospital or calling for emergency medical services, Defendant Littrell, Defendant Corn, and Defendant Zabloudil then took Smiley to "Cell #1" in the North Booking Area of the jail -- a cell with no furniture -- and placed her in the cell at 12:17:48 p.m. Another male Detention Officer followed them to the cell but did not go in.

76.     Defendant Littrell and Defendant Corn placed Smiley in the cell by physically placing her in a kneeling position with her hands against the walls in the back corner of the cell.

77.     Attached hereto and marked **Plaintiff's Exhibit 8** is a screenshot from video footage that has been produced by Defendant Duncan showing Smiley being placed in the cell by

Defendant Littrell and Defendant Corn.

78.     Smiley is at all times compliant with Defendant Littrell, Defendant Corn, and Defendant Zabloudil, and remains in the back corner of the cell until all three officers leave the room and close the door behind them.

79.     Attached hereto and marked **Plaintiff's Exhibit 9** is a screenshot from video footage that has been produced by Defendant Duncan showing Smiley in the back corner of the cell with her arms on the walls after the Detention Officers have shut the door behind them.

80.     Defendant Miller stood and watched Defendant Littrell, Defendant Corn, and Defendant Zabloudil place Smiley in the jail cell and then returned to her office, and tossed and orange slipper down the hallway in the direction of the cell.

81.     Attached hereto and marked **Plaintiff's Exhibit 10** is a screenshot from video footage that has been produced by Defendant Duncan showing Defendant Miller watching Defendant Littrell, Defendant Corn, and Defendant Zabloudil place Smiley in the jail cell.

82.     After Smiley was placed in the jail cell, she started pulling up her shirt, rolling around, fanning herself, taking her clothes off, and moving rapidly and erratically around the cell. She rolled and crawled on the cell floor often times with her head or face in contact with the wall. While lying on the floor she repeatedly arched her back and neck with her weight supported partially on her head, clearly in great physical distress.

83.     Attached hereto and marked **Plaintiff's Exhibit 11** is a screenshot from video footage that has been produced by Defendant Duncan showing Smiley about five minutes after she was placed in the cell.

84.     While Smiley was in the cell, Defendant Duncan, Defendant Wilhelm, Defendant Barber, and Defendant Littrell all failed to place Smiley on a four-times-per-hour direct observation watch, as required by 10A NCAC 14J.0601(c).

85.     Several of the times that Smiley was checked on in person it was by one of the Defendant detention officers walking by the door and glancing into it for a fraction of a second, which was grossly insufficient considering her life-threatening medical condition.

86.     Also, approximately 69 minutes of video footage of the hallway outside of Cell #1, during the one-and-a-half hour time period from 12:18:59 until 13:46:36, appears to have been <u>deleted</u> by someone with access to the master video files at the Buncombe County Detention Facility.   Specifically, at the time of this pleading, no video footage has been produced by Defendant Duncan of the hallway outside of Smiley's cell for the following time periods:

|   |   |   |   |
|---|---|---|---|
| 1) | 12:18:59 –> | 12:23:44 | 5 minutes, 45 seconds |
| 2) | 12:23:56 –> | 12:25:00 | 1 minute, 4 seconds |
| 3) | 12:25:11 –> | 12:25:37 | 26 seconds |
| 4) | 12:25:51 –> | 12:26:04 | 13 seconds |

11

| | | | |
|---|---|---|---|
| 5) | 12:26:21 –> | 12:27:16 | 55 seconds |
| 6) | 12:27:28 –> | 12:36:48 | 9 minutes, 20 seconds |
| 7) | 12:37:01 –> | 12:37:05 | 4 seconds |
| 8) | 12:37:17 –> | 12:37:19 | 2 seconds |
| 9) | 12:37:38 –> | 12:37:55 | 17 seconds |
| 10) | 12:38:06 –> | 12:38:55 | 49 seconds |
| 11) | 12:39:06 –> | 12:39:17 | 11 seconds |
| 12) | 12:39:29 –> | 12:39:33 | 4 seconds |
| 13) | 12:39:47 –> | 12:42:29 | 2 minutes, 42 seconds |
| 14) | 12:42:41 –> | 12:44:09 | 1 minute, 28 seconds |
| 15) | 12:44:22 –> | 12:44:46 | 24 seconds |
| 16) | 12:44:58 –> | 12:45:04 | 6 seconds |
| 17) | 12:45:15 –> | 12:46:42 | 1 minute, 27 seconds |
| 18) | 12:46:54 –> | 12:48:46 | 1 minute, 52 seconds |
| 19) | 12:48:58 –> | 12:49:00 | 2 seconds |
| 20) | 12:49:15 –> | 12:50:31 | 1 minute, 16 seconds |
| 21) | 12:50:43 –> | 12:53:36 | 2 minutes, 53 seconds |
| 22) | 12:53:48 –> | 12:54:03 | 15 seconds |
| 23) | 12:54:15 –> | 12:55:05 | 50 seconds |
| 24) | 12:55:24 –> | 12:55:28 | 4 seconds |
| 25) | 12:55:41 –> | 12:56:52 | 1 minute, 11 seconds |
| 26) | 12:57:04 –> | 12:59:16 | 2 minutes, 12 seconds |
| 27) | 12:59:28 –> | 13:03:19 | 3 minutes, 51 seconds |
| 28) | 13:03:40 –> | 13:09:08 | 5 minutes, 28 seconds |
| 29) | 13:09:24 –> | 13:11:18 | 1 minute, 54 seconds |
| 30) | 13:11:31 –> | 13:20:53 | 9 minutes, 22 seconds |
| 31) | 13:21:05 –> | 13:25:22 | 4 minutes, 17 seconds |
| 32) | 13:25:51 –> | 13:26:25 | 34 seconds |
| 33) | 13:27:00 –> | 13:27:23 | 23 seconds |
| 34) | 13:27:35 –> | 13:28:25 | 50 seconds |
| 35) | 13:28:39 –> | 13:28:45 | 6 seconds |
| 36) | 13:28:57 –> | 13:29:09 | 12 seconds |
| 37) | 13:29:21 –> | 13:29:44 | 23 seconds |
| 38) | 13:29:58 –> | 13:30:37 | 39 seconds |
| 39) | 13:29:58 –> | 13:30:37 | 39 seconds |
| 40) | 13:30:50 –> | 13:31:12 | 22 seconds |
| 41) | 13:31:26 –> | 13:31:40 | 14 seconds |
| 42) | 13:31:54 –> | 13:32:08 | 14 seconds |
| 43) | 13:35:55 –> | 13:36:37 | 42 seconds |
| 44) | 13:37:47 –> | 13:38:00 | 13 seconds |
| 45) | 13:39:28 –> | 13:39:38 | 10 seconds |
| 46) | 13:40:02 –> | 13:40:07 | 5 seconds |
| 47) | 13:40:43 –> | 13:40:51 | 8 seconds |
| 48) | 13:41:44 –> | 13:42:09 | 25 seconds |
| 49) | 13:42:22 –> | 13:42:42 | 20 seconds |
| 50) | 13:42:57 –> | 13:43:44 | 47 seconds |

| 51) | 13:44:05 –> | 13:44:14 | 9 seconds |
| 52) | 13:44:48 –> | 13:45:22 | 34 seconds |
| 53) | 13:46:00 –> | 13:46:11 | 11 seconds |
| 54) | 13:46:26 –> | 13:46:46 | 20 seconds |

87.     At about 12:23:41 p.m., Defendant Corn walked by Cell #1 and looked into the cell window for a fraction of a second. At that time, Smiley had taken her shirt off, was sitting on the floor, and was clearly in medical distress. Defendant Corn did nothing to assist her.

88.     At about 12:26:08 p.m., Defendant Parker walked by Cell #1 and turned his head toward the cell window for a fraction of a second and then continued walking down the hallway. At that time, Smiley was thrashing around on the floor under the door window. Defendant Parker did nothing to assist her.

89.     Attached hereto and marked **Plaintiff's Exhibit 12** is a screenshot from video footage that has been produced by Defendant Duncan showing Smiley's condition at about 12:26:08 p.m., when Defendant Parker walked by Cell #1 and turned his head toward the cell window for a fraction of a second.

90.     At about 12:39:40 p.m., Defendant Parker looked into the window of Cell #1 for a few seconds. At that time, Smiley was on her right side and was making repetitive arm and hand movements consistent with seizure activity. Defendant Parker did nothing to assist Smiley.

91.     Attached hereto and marked **Plaintiff's Exhibit 13** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 12:39:40 p.m., when Defendant Parker looked into the window of Cell #1 for several seconds.

92.     The video footage from inside the cell shows the window of the cell darken for about two seconds at 12:51:51 p.m., which is believed to be another in-person check by Defendant Parker. At that time, Smiley was on her back with her arms crossed and make movements consistent with seizure activity. Defendant Parker did nothing to assist Smiley.

93.     Attached hereto and marked **Plaintiff's Exhibit 14** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 12:51:51 p.m., when Defendant Parker looked into the window of Cell #1 for about two seconds.

94.     At about 12:53:25 p.m., Defendant Zabloudil looked into the window of Cell #1 for about 10 or 11 seconds. At that time, Smiley was lying on her back with her head against the back corner of the cell. Her left arm was extended and making repetitive movements consistent with seizure activity. Defendant Zabloudil did nothing to assist Smiley.

95.     Attached hereto and marked **Plaintiff's Exhibit 15** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 12:53:25 p.m., when Defendant Zabloudil looked into the window of Cell #1 for about 10 or 11 seconds.

96.     At about 1:02 p.m. and for several minutes thereafter, Smiley's head was still pressed up against the back corner of the cell and the only movement that she made was that her hands and feet would periodically twitch.  At that time, Smiley was in full cardiac arrest.

97.     Attached hereto and marked **Plaintiff's Exhibit 16** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 1:02 p.m.

98.     At about 1:08 p.m., Smiley's chest rises occasionally with respiration.  At about 1:10 p.m., Smiley stops breathing, at about 1:11 p.m., she stops moving, and at about 1:12 p.m. she is completely still and her face appears darker.

99.     Attached hereto and marked **Plaintiff's Exhibit 17** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 1:12 p.m.

100.     Smiley remains in this condition – not breathing, not moving, with her face appearing darker – for over 10 minutes before anyone checks on her in person.

101.     Attached hereto and marked **Plaintiff's Exhibit 14** is a copy of a "Patient Care Record" prepared by Buncombe County Emergency Medical Services (EMS) agents, which states in the "Narrative" on page 2: "Staff stated they watched PT on a cam laying on floor of cell waving her arms for approx an hour."

102.     During the time period from 12:17 p.m. until 1:24 p.m., Smiley was visible to Defendant Barber on a computer screen in his office from the video camera in her cell.

103.     Upon information and belief, Defendant Wilhelm had the ability to view Smiley in her cell on a computer screen in his office during the time period from 12:17 p.m. until 1:24 p.m., he knew or should have known of her life-threatening medical condition at or near the time she was placed in the cell, and he failed to direct any of the Defendants to transport Smiley to the hospital or to contact emergency medical services in sufficient time to save her life.

104.     At either 1:16 p.m. or 1:20 p.m., Defendant Barber looked at the video footage on the computer screen in his office and saw Smiley lying motionless on the floor.  He then called Defendant Zabloudil to go check on her.

105.     Attached hereto and marked **Plaintiff's Exhibit 18** and **Plaintiff's Exhibit 19** are screenshots from video footage produced by Defendant Duncan showing Smiley's condition at about 1:16 p.m. and 1:20 p.m., respectively.

106.     At about 1:23:29 p.m., Defendant Zabloudil went to Smiley's cell and looked into the window.  He then called over Defendant Riddle and Deputy Mandy Ladd to assist him.  The three of them looked into the cell for about a minute, trying to determine whether or not Smiley was breathing.

107.     Attached hereto and marked **Plaintiff's Exhibit 20** is a screenshot from video footage produced by Defendant Duncan showing Smiley's condition at about 1:23:29 p.m.

14

108.    Smiley was not checked on in person by anyone at the jail during the 30-minute time period from about 12:53 p.m. until about 1:23 p.m.

109.    At about 1:24:26 p.m., Defendant Riddle and Deputy Mandy Ladd entered Smiley's cell, while Defendant Zabloudil stood in the doorway.

110.    Defendant Riddle grabbed Smiley by her right wrist and felt for a pulse for a few seconds and, while shaking her head, said she did not feel a pulse and told Defendant Zabloudil to call for medical.  Riddle then pulled Smiley's body out from the corner by pulling on her right wrist and ankle and dragging her across the floor, and then rolled Smiley onto her right side.

111.    Attached hereto and marked **Plaintiff's Exhibit 21** is a screenshot from video footage produced by Defendant Duncan showing Defendant Riddle pulling Smiley's body out from the corner.

112.    Upon information and belief, Deputy Ladd leaned over and said to Smiley something like, "Hey, you've got to wake up!"  Smiley's face was wet and it looked as if she had thrown up and had been crying.

113.    At about 1:25:55 p.m., Deputy Ladd gave Smiley .4 mg of Naloxone (Narcan), which reduces the effect of an opiod overdose, but has no effect on a methamphetamine overdose.

114.    At about 1:24:04 p.m., Defendant Miller entered the cell and knelt down and starting feeling for a pulse on Smiley's wrist.  She said that she felt a faint pulse.

115.    At about 1:25:33 p.m., Defendant Miller did a sternum rub of Smiley's chest with her right hand, applying firm, direct, rotating pressure with the knuckles of one hand over the sternum.  Smiley did not respond.  She remained unconscious, not breathing.

116.    At about 1:25:42 p.m., Defendant Miller frantically placed the cuff of a blood presser meter onto Smiley's right arm, as Smiley lay motionless on the floor.

117.    Attached hereto and marked **Plaintiff's Exhibit 22** is a screenshot from video footage produced by Defendant Duncan showing Defendant Miller placing the cuff of a blood pressure meter onto Smiley's arm, as Smiley lay motionless on the floor.

118.    At approximately 1:26 p.m., well over an hour after it was clear that Smiley was undergoing a severe reaction to a methamphetamine overdose, a Detention Officer whose last name is "Ellis" called emergency medical services after being instructed to do so by someone.

119.    At about 1:26:36 p.m., Medical Officer Melissa Austin and Nurse Shannon Howard entered the cell.

120.    At about 1:28:00 p.m., Medical Officer Melissa Austin started doing chest compressions, after dragging Smiley's head away from the wall by her feet.  The chest compressions were initiated approximately 19 minutes after Smiley had stopped breathing.  The

15

CPR that was initiated first only consisted of chest compressions without rescue breaths.

121. The "Patient Care Record" prepared by Buncombe County EMS and attached hereto and marked **Plaintiff's Exhibit 14** indicates: "Staff stated PT vomited a large amount as soon as chest compressions initiated."

122. At 1:29:41 p.m., Nurse Shannon Howard used a bag to administer breaths, approximately 20 minutes after Smiley had stopped breathing.

123. Buncombe County EMS personnel arrived and took over medical treatment at approximately 1:32 p.m., and the Advanced Life Support (ALS) team from emergency medical services found Smiley to be pulseless.

124. At approximately 1:47 p.m., Buncombe County EMS personnel took Smiley out of the North Intake Area of the Buncombe County Detention Facility on a stretcher.

125. Attached hereto and marked **Plaintiff's Exhibit 23** is a screenshot from video footage produced by Defendant Duncan showing Buncombe County EMS personnel taking Smiley out of the Buncombe County Detention Facility.

126. Smiley was taken to the Emergency Department of Mission Hospital and arrived there at approximately 1:58 p.m. Smiley was intubated, given a dose of dextrose, and chest compressions were continued with an automated compression device.

127. After several minutes, the compression device was removed, and another pulse check was done, revealing no pulse. Smiley's core temperature was 104.4 degrees Fahrenheit. She was noted to be in asystole, which is the state of total cessation of electrical activity from the heart. After looking at her heart with bedside ultrasound and finding no activity whatsoever, Smiley was pronounced dead at 2:03 p.m.

128. An autopsy report later performed by a medical doctor indicated that the cause of death was "Methamphetamine toxicity."

## COMPLIANCE WITH RULE 9(j) OF THE
## NORTH CAROLINA RULES OF CIVIL PROCEDURE

129. The medical care and all medical records pertaining to the alleged negligence that are available to the Plaintiff after reasonable inquiry have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the North Carolina Rules of Evidence and who is willing to testify that the medical care and professional health services rendered to Plaintiff by Defendant Miller in this case did not comply with the accepted standards of care for her healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein, and that the breach of that standard of care and duty owed proximately caused the death of Plaintiff's decedent.

130. Plaintiff alleges that the negligent acts complained of also involve breaches of common law and statutory duties that amount to ordinary (as opposed to medical or professional)

negligence, and, as such, do not involve the rendering or failure to render medical care or professional health services to Plaintiff's decedent, and, accordingly, are not subject to the purported certification requirements of North Carolina Rule of Civil Procedure 9(j).

## FIRST CAUSE OF ACTION
### WRONGFUL DEATH: DEFENDANT DUNCAN, DEFENANT WILHELM, DEFENDANT LITTRELL, DEFENDANT BARBER, DEFENDANT ZABLOUDIL, DEFENDANT CORN, DEFENDANT PARKER, AND DEFENDANT RIDDLE

131.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

132.    N.C.G.S. § 153A-224 is a safety statute expressly enacted to protect a detainee like Smiley whose liberty has been taken and who is confined in a local detention facility.

133.    The Buncombe County Detention Facility is a local confinement facility for purposes of N.C.G.S. § 153A-224.

134.    The actions and omissions of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, including failing to keep Smiley under a special watch, failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Smiley to the hospital emergency department after it was clear that Smiley was undergoing a severe reaction to a methamphetamine overdose violated their affirmative obligation under N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care for Smiley, as well as state regulations on observing inmates and reporting medical concerns.

135.    Their breaches of the affirmative duty imposed by a safety statute constituted negligence *per se*.

136.    These breaches of statutory duties imposed by N.C.G.S. § 153A-224 to provide continuous custodial supervision of detainees and to secure emergency medical care precludes the application of governmental immunity.

137.    As a proximate result of Defendant Wilhelm, Defendant Littrell's, Defendant Barber's, Defendant Zabloudil's, Defendant Corn's, Defendant Parker's, and Defendant Riddle's negligence, Smiley suffered agonizing pain and humiliating abandonment, until she died.

138.    Sheriff Duncan is liable, under the doctrine of *respondeat superior*, both under common law and by statute, for the actions and omissions of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle that led to Smiley's death.  The Sheriff's duty to operate the county jail in a safe manner is a non-delegable duty under N.C.G.S. § 162-24.

17

139. Further, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle are individually liable. Some of their actions were taken outside the scope of their authority, including the systematic avoidance of required in-person cell checks. Further, their actions of failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" while she was being processed, after she showed signs of a severe drug overdose, and after she was placed in a jail cell and left to suffer until she suffered a heart attack, became unconscious and stopped breathing, all demonstrated malice and willful and wanton and reckless disregard for her safety. Conduct that exceeds the scope of authority or that shows such malice and willful or wanton or reckless disregard for a pre-trial detainee pierces the shield of public officer immunity.

140. As a proximate result of Defendant Wilhelm's, Defendant Littrell's, Defendant Barber's, Defendant Zabloudil's, Defendant Corn's, Defendant Parker's, and Defendant Riddle's malicious, willful, wanton, and reckless conduct, Smiley suffered agonizing pain and humiliating abandonment, until she died.

141. Plaintiff, in her capacity as Administrator of the Estate, is entitled to recover from Defendant Duncan, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Smiley experienced in time before her death.

142. Plaintiff also seeks and is entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendant Duncan, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle. The actions of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle showed actual malice toward Smiley and willful and wanton and reckless disregard for her safety.

## SECOND CAUSE OF ACTION
### WRONGFUL DEATH: DEFENDANT MILLER
### AND DEFENDANT SECMG

143. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

144. Defendant Miller did not comply with the accepted standards of care for her healthcare profession in the same or similar communities at the times of the negligent acts and/or omissions complained of herein.

145. Defendant Miller is liable and was negligent in at least the following respects:

a.    Failing to provide appropriate medical treatment to Smiley and/or failing to contact emergency medical services after Smiley reported to Miller, during the booking

18

process, that she had swallowed "a lot" of "meth;"

b.     Failing to provide appropriate medical treatment to Smiley and/or failing to contact emergency medical services after Smiley showed signs of experiencing a severe drug overdose while she was being processed; and

c.     Otherwise failing to comply with the accepted standards of care for her healthcare profession in the same or similar communities.

146.    As a proximate result of Defendant Miller's negligence, Smiley suffered agonizing pain and humiliating abandonment, until she died.

147.    A person of ordinary intelligence and prudence could have foreseen that death would be the probable result of the failure to provide proper medical care to a person who had ingested an unknown dosage of methamphetamine.

148.    SECMG is liable, under the doctrine of *respondeat superior*, for the medical negligence of its agent, Defendant Miller, in providing healthcare to Smiley.

149.    SECMG also failed to adhere to the medical care plan submitted to and approved by County officials, as required by N.C.G.S. § 153A-225 and 10A N.C.A.C. 14J.1001, because the nursing staff, including Defendant Miller, was not supervised by a licensed physician, exceeding the scope of their licensure and constituting negligent supervision.

150.    Plaintiff, in her capacity as Administrator of the Estate, is entitled to recover from Defendants Miller and SECMG, jointly and severally, all damages for wrongful death as allowed by N.C.G.S. § 28A-282(b), including but not limited to damages for pain and suffering and humiliation that Smiley experienced in time before her death.

151.    Plaintiff also seeks and is entitled under Chapter 1D and N.C.G.S. § 28A-18-2(b)(5) to punitive damages against Defendants Miller and SECMG, jointly and severally. The actions of Defendant Miller showed actual malice toward Smiley and willful and wanton and reckless disregard for her safety. Defendant Miller was the managing agent for SECMG in the jail, subjecting SECMG to punitive damages.

## THIRD CAUSE OF ACTION
### FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:
### DEFENDANT DUNCAN, DEFENDANT WILHELM, DEFENDANT LITTRELL, DEFENDANT BARBER, DEFENDANT ZABLOUDIL, DEFENDANT CORN, DEFENDANT PARKER, AND DEFENDANT RIDDLE

152.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

153.    All Defendants except the Surety are "persons," and their actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

19

154.     The rights of pre-trial detainees and the conduct of Defendant Duncan, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

155.     The practice in the jail of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care and systematically failing to place medically distressed detainees on a four-times-per-hour direct observation watch as required by North Carolina law [10A NCAC 14J.0601(c)] violated the standard of objective reasonableness.

156.     Defendant Duncan also failed to train his detention facility officers and other agents, including the Defendants herein, in recognizing and properly responding to a methamphetamine overdose, which also violates the standard of objective reasonableness. Defendant Duncan is sued in his official capacity for this Fourteenth Amendment violation.

157.     Further, the specific acts and omissions of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle complained of herein were objectively unreasonable and violated Smiley's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" and after she showed signs of undergoing a severe drug overdose.

158.     Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference.  These included the acts of failing to provide appropriate medical treatment, failing to contact emergency medical services, failing to secure emergency medical care from a licensed physician, and/or failing to transport Smiley to the hospital after she had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

159.     Further, Smiley was detained under conditions that posed a substantial risk of serious harm, and Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle knew of and disregarded those risks to Smiley's health and safety, including hearing, seeing, and ignoring her condition of overdosing on methamphetamines, which violated Smiley's Fourteenth Amendment rights.

160.     Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions complained of herein showed reckless disregard and open contempt for Smiley's well-being by Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, satisfying the deliberate indifference standard.

161.     Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle had actual and constructive knowledge of Smiley's serious medical condition but were deliberately indifferent to Smiley's need for critical and essential assessment and medical treatment.

162.     Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle are sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

163.     The actions of these same individual Defendants so violated the standards of decency as to shock the conscience of the community and thus violated Smiley's right to substantive due process also protected by the Fourteenth Amendment.

164.     As a result of these violations by Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, Smiley suffered an agonizing death under inhumane conditions and was left to die in her jail cell.

165.     Plaintiff seeks and is entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, including but not limited to damages for the pain and suffering and humiliation that Smiley experienced before her death.

166.     Plaintiff also seeks and is entitled to punitive damages from Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle in their individual capacities, as allowed under 42 U.S.C. § 1983, due to their deliberate and reckless indifference to Smiley's federally protected rights.

167.     Defendant Duncan is also liable as the supervisor and director of the jail, due to the practices at the jail of failing to immediately refer arrestees who are in urgent need of medical attention for emergency care, not properly training the jail's detention officers on how to attend to the urgent medical needs of detainees who have overdosed on methamphetamines, and failing to place Smiley on a four-times-per-hour direct observation watch, as required by law.  There was a causal link between the willful and wanton indifference to these jail process, guard training, and detainee monitoring deficiencies and Smiley's death.

168.     Defendant Wilhelm is also liable as the supervisor of Defendants Littrell, Barber, Zabloudil, Corn, Parker, and Riddle, as he implicitly authorized, approved, or knowingly acquiesced in their deliberate indifference to Smiley's federally protected rights.  Upon information and belief, Defendant Wilhelm had the ability to view Smiley in her cell on a computer screen in his office during the time period from 12:17 p.m. until 1:24 p.m., he knew or should have known of her life-threatening medical condition at or near the time she was placed in the cell, and he failed to direct any of the Defendants to transport Smiley to the hospital or to contact emergency medical services in sufficient time to save her life.

### FOURTH CAUSE OF ACTION
### FOURTEENTH AMENDMENT VIOLATIONS / 42 U.S.C. § 1983:
### DEFENDANT MILLER AND DEFENDANT SECMG

169.     All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

170.    Defendants Miller and SECMG are "persons," and her actions and omissions complained of herein were taken under color of state law for purposes of 42 U.S.C. § 1983.

171.    The rights of pre-trial detainees and the conduct of Defendants Miller and SECMG towards Smiley are governed by the due process clause of the Fourteenth Amendment, which sets a standard of objective reasonableness.

172.    The specific acts and omissions of Defendant Miller complained of herein, which are imputed to Defendant SECMG, were objectively unreasonable and violated Smiley's rights under the Fourteenth Amendment, including failing to provide appropriate medical treatment and failing to contact emergency medical services after Smiley had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

173.    Further, those same specific acts described herein violated the prior Fourteenth Amendment standard of deliberate indifference.  These included Defendant Miller's acts of failing to provide appropriate medical treatment and failing to contact emergency medical services after Smiley had reported that she had swallowed "a lot" of "meth" and after she showed signs of a severe drug overdose.

174.    Further, Smiley was detained under conditions that posed a substantial risk of serious harm, and Defendant Miller knew of and disregarded those risks to Smiley's health and safety, including hearing, seeing, and ignoring her condition of overdosing on methamphetamines, which violated Smiley's Fourteenth Amendment rights.

175.    Further, to the extent the Court finds that a deliberate indifference standard applies to the conditions of pre-trial confinement, the actions and omissions of Defendant Miller complained of herein showed reckless disregard and open contempt for Smiley's well being, satisfying the deliberate indifference standard.

176.    Defendant Miller had actual knowledge of Smiley's serious medical condition but was deliberately indifferent to Smiley's need for critical and essential assessment and medical treatment.

177.    Defendant Miller is sued individually under 42 U.S.C. § 1983 for these Fourteenth Amendment violations.

178.    The actions of Defendant Miller, which are imputed to Defendant SECMG, so violated the standards of decency as to shock the conscience of the community and thus violated substantive due process also protected by the Fourteenth Amendment.

179.    As a result of these violations by Defendants Miller and SECMG, Smiley suffered an agonizing death under inhumane conditions.

180.    Plaintiff seeks and is entitled to compensatory damages as allowed under 42 U.S.C. § 1983 and N.C.G.S. § 28A-18-2(b)(5) against Defendants Miller and SECMG, including but not limited to damages for the pain and suffering and humiliation that Smiley experienced in the time

before her death.

181. Plaintiff also seeks and is entitled to punitive damages as allowed under 42 U.S.C. § 1983, due to Defendant Miller's reckless indifference to Smiley's federally protected rights.

## FIFTH CAUSE OF ACTION
### ACTION UNDER THE BOND

182. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

183. The actions of Defendant Duncan, including the systemic failure to train his detention officers and his failure to monitor pre-trial detainees, and the discrete, described acts of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle constituted neglect and malfeasance in their employment with Sheriff Duncan and were taken under the auspices of the office of the Sheriff. As a proximate result, the decedent suffered intense mental and physical pain and died.

184. Further, the negligence of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle should be covered by the Bond, as those Defendants were acting under the non-delegable authority of the Sheriff at all times. As a proximate result, decedent suffered intense mental and physical pain and died.

185. Plaintiff brings this action for wrongful death on the Sheriff's bond pursuant to N.C.G.S. § 58-76-5.

186. Plaintiff, in her capacity as Administratrix of the Estate, is entitled to recover on the bond all damages for wrongful death caused by the neglect and malfeasance of the Sheriff and his agents, as allowed by N.C.G.S. § 28A-28-2(b). Such damages are in excess of $25,000.00. Plaintiff may sue repeatedly on the bond until the judgment is paid.

## SIXTH CAUSE OF ACTION
### N.C.G.S. § 162-55

187. All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

188. The actions and omissions of Defendant Duncan, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle showed such reckless indifference and thoughtless disregard for Smiley's safety that Plaintiff is entitled to recover treble the compensatory damages awarded to the Estate from them, pursuant to N.C.G.S. § 162-55. Under the case law, such reckless indifference is equivalent to criminal neglect.

## SEVENTH CAUSE OF ACTION
### N.C.G.S. § 162-50

189.    All prior paragraphs of the Complaint are hereby incorporated by reference as if fully set out herein.

190.    The actions and omissions of Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle, which are imputed to Sheriff Duncan under the principle of *respondeat superior*, constituted willful failure or neglect to perform duties imposed upon them under Chapter 162 of the North Carolina General Statutes, including N.C.G.S. § 162-22 (duty to have "care and custody of the jail") and § 162-55 (duty to not "do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law"), entitling Plaintiff to a penalty of five hundred dollars ($500.00) under N.C.G.S. § 162-50, in addition to all other remedies sought herein.

## JURY DEMAND

191.    Plaintiff requests that all issues be tried before a jury of her peers.

WHEREFORE, Plaintiff, as Administratrix of the Estate, upon the trial of this matter before a jury, prays that the Court enter judgment for Plaintiff and order the following relief:

1.    Judgment against Defendant Duncan in his official capacity under principles of *respondeat superior*, and against Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle individually, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

2.    Judgment against Defendant Miller and Defendant SECMG, jointly and severally, for all wrongful death damages recoverable under N.C.G.S. § 28A-18-2(b), including punitive damages.

3.    Judgment against Defendant Duncan in his official capacity, and against Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle in their individual capacities, under 42 U.S.C. § 1983 for compensatory damages.

4.    Judgment against Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil, Defendant Corn, Defendant Parker, and Defendant Riddle in their individual capacities under 42 U.S.C. § 1983 for punitive damages.

5.    Judgment against Defendant Miller and Defendant SECMG, jointly and severally, under 42 U.S.C. § 1983 for compensatory damages and punitive damages.

6.    An award of treble the compensatory damages against Defendant Duncan, Defendant Wilhelm, Defendant Littrell, Defendant Barber, Defendant Zabloudil,

Defendant Corn, Defendant Parker, and Defendant Riddle, and against Defendants Miller and SECMG, under N.C.G.S. § 162-55.

7.    An Order that Defendants pay Plaintiff's costs as allowed under 42 U.S.C. § 1988, including reasonable attorneys' fees.

8.    That the Court grant such other and further relief as it deems equitable and just.

Respectfully submitted, this the 22nd day of May, 2019.

By:    /s/ Stephen P. Agan
        Stephen P. Agan, State Bar #35763
        George B. Hyler, Jr., State Bar #5682
        *Attorneys for Plaintiff*
        Hyler & Lopez, PA
        38 Orange Street
        Asheville, NC 28801
        Telephone: (828) 254-1070
        Facsimile: (828) 254-1071
        stevea@hylerlopez.com
        george@hylerlopez.com


By:    /s/ John M. Olesiuk
        John M. Olesiuk, State Bar #13637
        B. Todd Lentz, State Bar #27941
        *Attorneys for Plaintiff*
        DeVere Lentz & Associates
        30 Choctaw Street, 2nd Floor
        Asheville, NC 28801
        Telephone: (828) 258-1441
        Facsimile: (828) 258-1454
        jmolesiuk@lentz.law
        btlentz@lentz.law